IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

EDDA CINTRON,
et al.

    Plaintiffs

v.                        Civil No. 05-2077(SEC)

PAVIA HATO REY HOSPITAL,
et al

    Defendants

**OPINION AND ORDER**

Pending before the Court is Plaintiffs Edda Cintrón, Luis A. Valentín-Cintrón, Laura Valentín-Cintrón and Luis E. Valentín Cintrón's (hereinafter "Plaintiffs") Motion for Reconsideration (Docket # 131), and Co-Defendant Pavia Hato Rey Hospital's (hereinafter "Pavia") opposition thereto (Dockets ## 132 & 134). After reviewing the filings and the applicable law, for the reasons explained below, the Motion for Reconsideration is **DENIED.**

**Procedural and Factual Background**

Pursuant to this Court's March 27, 2007 Opinion & Order, Plaintiffs' claim under the Emergency Medical Treatment and Active Labor Act's (EMTALA), 42 U.S.C. §1395dd *et seq*, screening provision was dismissed with prejudice. Docket # 83. Thereafter, on July 10, 2008, this Court also dismissed Plaintiffs' claim for failure to stabilize under EMTALA as well as their supplemental medical malpractice claims under state law. Docket # 129. According to this Court's prior opinions, the facts of the case are as follows:

On October 8, 2004, Mr. Luis Valentín-Cintrón (hereinafter "Mr. Valentín"), a forty-seven year old psychiatric patient, intentionally overdosed on several medications. Mr. Valentín arrived at the emergency room of Pavía at approximately 2:16 PM. At approximately 4 PM, a physical examination was performed and a basic workup, including blood count, basic metabolic panel, urinalysis, and arterial blood gases, was ordered. Per the Emergency Room Record, the attending physician's diagnosis was suicide attempt. At 8:55 PM, the lab report showed an elevated white

blood cell and hemoglobin count. At 11:10 PM of that same day, Mr. Valentín was pronounced dead.

As a result of the foregoing, Plaintiffs filed suit under EMTALA and for medical malpractice against Pavia, Dr. Richard Conelly and Dr. Ramon Ochoa, the atttending physicians at said hospital's emergency room, among other defendants (collectively "Defendants"). Docket # 1. On August 26, 2006, Pavía filed a motion for summary judgment, arguing that no EMTALA violation took place and thus, Plaintiffs' claims should be dismissed. Docket # 53. In the March 27, 2007 Opinion & Order, Plaintiffs' claim under EMTALA's screening provision was dismissed by this Court. However, Plaintiffs' claims under EMTALA's stabilization provision and supplemental malpractice claim remained pending before this Court.

On April 13, 2007, Pavía filed a second motion for summary judgment, requesting the dismissal of Plaintiffs' claim under EMTALA's stabilization provision as well as Plaintiffs' supplemental malpractice claim. Pavía argued that the former only applied when patients were discharged or transferred to another hospital, and Mr. Valentín was neither discharged nor transferred. As such, Pavía averred that dismissal was warranted. Plaintiffs opposed, arguing that despite the fact that the patient was not transferred, he was left unmonitored and untreated until his death, which constituted "constructive dumping" under In the matter of Baby K, 16 F.3d 590 (4th Cir. 1994). In its July 10, 2008 Opinion & Order, this Court concluded that Defendants did not violate EMTALA's stabilization provision because no emergency condition was found during the patient's screening and therefore, Pavía had no duty to stabilize Mr. Valentín. Docket # 129. This Court held that since EMTALA requires stabilization only when an emergency condition is discovered during the screening process, Defendants complied with their statutory duty under EMTALA. Id. Upon this Court's dismissal of Plaintiffs' federal claims, their supplemental state law claim was also dismissed. Id. On July 16, 2008, Plaintiffs filed the instant motion for reconsideration. Docket # 131.

**Standard of Review**

FED. R. CIV. P. 59(e) allows a party, within ten (10) days of the entry of judgment, to file a motion seeking to alter or amend said judgment. The rule itself does not specify on what grounds

**Civil No. 05-2077**                                                                                                    3
_____

the relief sought may be granted, and courts have ample discretion in deciding whether to grant or deny such a motion. Venegas-Hernández v. Sonolux Records, 370 F.3d 183, 190 (1st Cir. 2004) (citations omitted). In exercising that discretion, courts must balance the need for giving finality to judgments with the need to render a just decision. Id. (citing Edward H. Bolin Co. v. Banning Co., 6 F.3d 350, 355 (5th Cir. 1993)). Despite the lack of specific guidance by the rule on that point, the First Circuit has stated that a Rule 59(e) motion "must either clearly establish a manifest error of law or must present newly discovered evidence." F.D.I.C. v. World Univ., Inc., 978 F.2d 10, 16 (1st Cir. 1992) (citing Fed. Deposit Ins. Corp. v. Meyer, 781 F.2d 1260, 1268 (7th Cir. 1986)). Rule 59(e) may not, however, be used to raise arguments that could and should have been presented before judgment was entered, nor to advance new legal theories. Bogosonian v. Woloohojian Realty Corp., 323 F.3d 55, 72 (1st Cir. 2003).

**Applicable Law and Analysis**

Plaintiffs request that this Court set aside its July 10, 2008 Opinion & Order and Judgment, granting Defendants' motion for summary judgment and dismissing both their EMTALA stabilization provision claim and supplemental malpractice claim. Plaintiffs first contend that even if this Court were to uphold its previous ruling as to the dismissal of the EMTALA claims, it still has jurisdiction over the instant case pursuant to the diversity of citizenship statute. As such, they argue that this Court can entertain the supplemental state law claims. This Court disagrees.

Upon reviewing the record, this Court finds that Plaintiffs' claims were exclusively premised on a federal question, *i.e*, the EMTALA provisions. Thus, Plaintiffs never asserted diversity jurisdiction prior to the dismissal of the case. As a result, Defendants did not have the opportunity to question the court's diversity jurisdiction. Granting Plaintiffs' request would be prejudicial to Defendants, who would be forced to incur in additional expenses to litigate a dispositive issue that Plaintiffs failed to assert before the dismissal of the case. See e g., In re Basis, Inc., 551 F. Supp. 2d 122, 126 (D.Mass. 2008) (finding that although the initial complaint was premised on both federal question and diversity jurisdiction, it was superceded by the amended complaint, which was only

**Civil No. 05-2077**                                                                                                                          4
_____

premised on federal question, and, as a result, Plaintiffs could not re-assert diversity jurisdiction after the dismissal of the case for lack of federal question jurisdiction). Thus, Plaintiffs' argument is untimely.

Moreover, the complaint does not support Plaintiffs' allegation of diversity of citizenship Historically, diversity jurisdiction requires complete diversity of citizenship between all plaintiffs and all defendants. Connectu LLC v. Zuckerberg, 522 F.3d 82, 91 (1st Cir. 2008). The Supreme Court has held that "[i] a case with multiple plaintiffs and multiple defendants, the presence in the action of a single plaintiff from the same State as a single defendant deprives the district court of original diversity jurisdiction over the entire action." Exxon Mobil Corp. v. Allapattah Servs., 545 U.S. 546, 553 (2005). In the instant case, Plaintiffs concede that they are Puerto Rico citizens. Aside from noting that Luis E. Valentín-Cintrón, the deceased's son, is from Rhode Island, Plaintiffs proffer no additional argument to show that complete diversity is present. Albeit Luis E. Valentín is a Rhode Island resident, pursuant to the complaint, all other Plaintiffs are Puerto Rico residents and, at least, Co-Defendant Pavía is as well.  This in itself defeats diversity. As such, this Court finds that complete diversity is lacking and Plaintiffs' arguments as to diversity jurisdiction fail.

Plaintiffs second argument focuses on Pavía's alleged failure to properly screen the patient as required by EMTALA. They aver that Pavía failed to provide the treatment and services afforded to other patients suffering from similar conditions. In opposition, Pavía argues that Plaintiffs' request for reconsideration on the screening provision of EMTALA is untimely, since this Court dismissed said claim on March 27, 2007. This Court agrees. The record shows that Plaintiffs' EMTALA screening provision claim was dismissed on March 27, 2007. As previously stated, under FED. R. CIV. P. 59(e), within ten (10) days of the entry of judgment, a party may file a motion seeking to alter or amend said judgment. Said provision seeks to balance the need for giving finality to judgments with the need to render a just decision. In the instant case, Plaintiffs never requested this Court to reconsider its March 27, 2007 decision. Moreover, the instant motion was filed on July 16, 2008, that is, well over a year after said opinion. As such, their request for reconsideration as to the dismissal

of EMTALA's screening provision is untimely and, as a result, is **DENIED**.

Finally, although Plaintiffs concede that Mr. Valentin was never transferred or discharged, they argue that Defendants' lack of monitoring and treatment of the patient constitutes "constructive dumping" pursuant to In the matter of Baby K, 16 F.3d 590 (4th Cir. 1994) and, as a result, this Court should reconsider its prior decision. In its opposition, Pavía argues that EMTALA's stabilization requirement only applies when the hospital determines that an emergency medical condition is present. Pavía contends that upon Mr. Valentín's arrival, he was properly screened and remained stable thereafter. Thus, stabilization was unnecessary in the absence of an emergency medical condition.

Pavía also avers that Plaintiffs' argument as to Pavía's alleged lack of monitoring and treatment of Mr. Valentín constitutes a medical malpractice claim and not an EMTALA claim. Pavía further argues that considering that Plaintiffs' EMTALA claims were properly dismissed, this Court should not exercise supplemental jurisdiction over a malpractice claim arising under state law. Notwithstanding, Pavía contends that Plaintiffs' expert admitted that the patient's death was caused by a drug overdose. As a result, Pavía reasons that, even if this Court were to entertain Plaintiffs' malpractice claim, they failed to establish a causal relationship between the alleged medical malpractice and the patient's death, and as such, their malpractice claims fail as well.

As explained in our prior Opinion & Order, EMTALA is the result of Congressional concern about reports that hospital emergency rooms, driven by concern for their bottom line, were refusing to accept or treat patients with emergency medical conditions that lacked medical insurance. See Correa v. Hospital San Francisco, 69 F.3d 1148, 1189 (1st Cir. 1995) (citing the legislative record of EMTALA). In order to counter the evils associated with this practice, Congress enacted EMTALA, which "created a remedy for patients in certain contexts in which a claim under state medical malpractice law was not available." Reynolds v. Maine General Health, 218 F. 3d 78, 83 (1st Cir. 2000). As such, EMTALA complements but does not displace or substitute traditional state-law tort remedies for medical malpractice. See id. at 83-84 (holding that "EMTALA is a limited

**Civil No. 05-2077**                                                                                                          6
_____

'anti-dumping' statute, not a federal malpractice statute"; EMTALA "designed to complement and not incorporate state malpractice law") (citations omited); Correa, 69 F.3d at 1192 (holding that "EMTALA does not create a cause of action for medical malpractice") (citations omitted).

EMTALA is comprised of two key requirements imposed on hospitals with emergency rooms: (1) that, once a patient arrives at their doorstep requiring treatment or examination, the emergency room provide a medical screening examination of that patient that is adequate within the particular emergency room's capabilities, and (2) that if an emergency medical condition is determined to exist, the patient be stabilized prior to discharge or transfer to another facility. See Guadalupe v. Negrón-Agosto, 299 F.3d 15, 19 (1st Cir. 2005) (finding that "[b]y its terms, EMTALA is designed to assure that any person visiting a covered hospital's emergency room is screened for an emergency medical condition and is stabilized if such condition exists"); Reynolds, 218 F.3d at 83 (holding that "at a minimum Congress manifested an intent that all patients be treated fairly "). Whereas Subsection (a) deals with the screening requirement, 42 U.S.C. §1395dd(a), subsection (b) deals with the stabilization requirement, and as such, provides that:

> [i]f any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either--
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> (B) for transfer of the individual to another medical facility in accordance with [the statute]. 42 U.S.C. §1395dd(b).[1]

---

[1] A plaintiff may assert causes of action under either the screening or stabilization provisions of EMTALA, or both. Regardless of the plaintiff's choice as to how to proceed, under one provision, the other, or both, in order to prevail on her EMTALA claim, she must show that:

 (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility); (2) the patient arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.    `

Correa, 69 F. 3d at 1190 (citing Miller v. Medical Ctr. Of S.W. La., 22 F. 3d 626, 628 (5th Cir. 1994)); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir. 1990).

**Civil No. 05-2077**                                                                                                              7
_____

With regards to stabilization, EMTALA prohibits transfer or discharge before a patient's condition is stabilized. Correa, 69 F. 3d at 1190. It is important to remember that EMTALA is an anti-dumping act, designed to evaluate whether or not a hospital has given proper medical treatment to a patient that it has transferred or released. Id. at 1189; Sanchez Rivera v. Doctors Ctr. Hosp., Inc., 247 F. Supp. 2d 90, 98 &105 (D.P.R. 2003). Specifically, to establish a civil claim under EMTALA for failing to stabilize a patient before transfer or discharge, Plaintiffs need to prove: (1) the hospital had to have actual knowledge that a patient was suffering from an "emergency medical condition," and (2) the hospital did not, taking into consideration the staff and facilities available at the hospital, provide the necessary stabilizing treatment. Therefore, in order to assess compliance with EMTALA's stabilization provision, the court must first determine whether Pavía effectively concluded Mr. Valentín had an emergency medical condition and, if this requirement is met, determine whether Plaintiff was stabilized.

Although Plaintiffs assert that Mr. Valentín was essentially left unattended for several hours in the emergency room, this does not prove that the EMTALA-required stabilization failed to take place. As previously stated, a hospital is liable under EMTALA's stabilization provision when, despite having knowledge of the patient's emergency condition, it fails to provide stabilizing treatment. As this Court previously held, Mr. Valentín was properly screened and no emergency condition was found.

Despite the arguments set forth in the instant motion, Plaintiffs have not shown that Pavía was aware that Mr. Valentín was suffering from an emergency condition. Moreover, Plaintiffs' own expert report concluded that Mr. Valentín showed no signs of an emergency condition. Instead, Plaintiffs' arguments and their supporting evidence tend to show that Mr. Valentín was not properly treated, or even treated at all. That however, is a problem separate and distinct from the issue of appropriate screening and stabilization under EMTALA, and is more properly asserted in a medical malpractice claim. As such, Plaintiffs' EMTALA stabilization claim was properly dismissed and their request for reconsideration on said issue is **DENIED**. Furthermore, considering that Plaintiffs'

**Civil No. 05-2077(SEC)**                                                                                                          8
_____

EMTALA claims were properly dismissed, this Court cannot entertain Plaintiffs state law claims bought under this Court's supplemental jurisdiction.

### Conclusion

For the reasons set herein, Plaintiffs' Motion for Reconsideration is **DENIED**.

**SO ORDERED.**

In San Juan, Puerto Rico, this 20th of February, 2009.

> *S/Salvador E. Casellas*
> SALVADOR E. CASELLAS
> U.S. Senior District Judge